UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBERT GORMAN,

        Plaintiff,

-against-

EXPERIAN INFORMATION SOLUTIONS,
INC., EQUIFAX INFORMATION SERVICES,
INC., and HSBC MORTGAGE SERVICES,
INC.,

        Defendants.

Civil Action No.: 07 CV 1846 (Patterson, J.)

ECF Case

---

## DECLARATION OF DAVID BROWNE

I, David Browne, declare and state as follows:

1.    I am a Compliance Manager for Experian Information Solutions, Inc. ("Experian"). I have been so employed at Experian since September 1996, the effective date of Experian's acquisition of TRW Inc.'s ("TRW") consumer credit reporting business. I previously was similarly employed by TRW for approximately twenty years. During my last nine years at TRW, I assisted in ensuring TRW's compliance with the Fair Credit Reporting Act ("FCRA"). Based on my experience, coupled with the fact that I have reviewed many thousands of credit reports, I have substantial knowledge about Experian's policies and procedures for the compilation, retention, reinvestigation and disclosure of consumer credit information. The facts stated in this declaration are true of my own personal knowledge, and if called to testify to them, I would competently do so.

2.    I make this declaration in support of Experian's Motion For Summary Judgment.

3. Experian operates a consumer credit reporting agency pursuant to the Federal Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* ("FCRA"). As a credit reporting agency, Experian acts as a conduit of credit information that is pertinent to prudent credit granting and related decisions. Experian gathers credit information originated by others and makes that information available to parties engaged in credit related transactions. Thus, Experian does not originate or create any credit information and Experian does not make loans or decide who should receive credit. Both of these functions are handled entirely by the credit granting industry, over which Experian has absolutely no control. All told, Experian receives information from approximately 30,000 sources.

4. Experian follows reasonable procedures in assuring maximum possible accuracy. These include the procedures followed for the processing of information reported to Experian by creditors. Experian only accepts consumer credit information from sources that it considers to be reliable reporters of such information. After Experian determines that a creditor is reliable, the creditor is permitted to submit tapes or electronic transmissions, typically on a regular basis, to Experian containing consumer credit information that will be entered into Experian's computer system. Additionally, Experian has built into its computer system an extensive range of checks that are designed to detect as many potential errors as possible. These checks include the creating of individual profiles of how individual lenders have reported over the most recent prior three months and comparing such profile against the most recently received report of credit information from the creditors in order to detect anomalies. Approximately fifty million accounts are reported each day to Experian. Experian's validation of consumer credit information, of necessity, is unable to extend to conducting an independent hearing with respect to each account being reported and nor is it required under the FCRA.

5. I have reviewed Plaintiff Robert Gorman's Experian credit file and have reviewed the documents produced by parties to this action. Included among these documents are documents produced by Plaintiff which purport to be excerpts of documents relating to home loan applications made by Plaintiff in January 2007.

6. Due to the my years of experience with Experian and TRW, and the responsibilities of my job, I have reviewed thousands of "adverse action" and/or credit denial letters for lenders, and I am quite familiar with the procedures, conventions and requirements relating to the issuance of such adverse action letters.

7. The single page document excerpt produced by Plaintiff featuring the letterhead of "United Community Bank" indicates, in part, that Plaintiff's application for a first mortgage loan has been declined due to "[d]elinquent past or present credit with others." While the page suggests that the credit decision was based, at least in part, upon a credit report obtained "from the credit reporting agency listed below", the single page, in fact, lists no credit reporting agency or agencies as actual source of a credit report upon which the decision would be based. While the page does not entirely discount the possibility that the decision was based upon an Experian credit report, it is unclear and impossible to determine from the page alone whether the credit decision itself was actually based upon a credit report from none or any one of the major credit reporting agencies (including Trans Union, Equifax and Experian), reports from all three, or a combination of some subset of the three credit reporting agencies, or from some alternate source.

8. Furthermore, with regard to "United Community Bank" page reference to "delinquent past or present credit with others," upon review of contemporaneous Experian consumer disclosures relating to Plaintiff, there are at least eleven separate credit delinquencies listing in Plaintiff's credit file, aside from the credit line items relating to Plaintiff's primary and

secondary mortgages, and at least eight of those delinquencies occurred in 2003 or later. There is no indication from the page that the delinquent "past or present credit with others" was referring specifically to the credit reporting of Plaintiff's secondary mortgage account with HSBC Mortgage Services. Denials based upon a serious derogatory credit event, such as a default on a home mortgage, be it by deed-in-lieu of foreclosure, judicial foreclosure, non-judicial foreclosure, etc., typically will be listed on adverse action letters in such a way to refer to the derogatory event more specifically and more significantly than simply being listing it generally as "delinquent past or present credit with others."

9. The two-page document produced by Plaintiff with a "CredStar" letterhead indicating a "Score/Ordered Date" of January 12, 2007 refers therein to three separate credit risk scores obtained from the three major credit reporting agencies "in connection with your application for a home loan." The 2-page document is not an "adverse action letter," particularly as there is no reference to any final decision by the lender. The document does not, in itself, suggest whether the applicant's loan application was finally granted or denied. The document is instead a "notice to the home loan applicant" that credit reports have been obtained in conjunction with the home loan application and providing some detail of same.

10. As part of the same exhibit (marked Plaintiff's Exhibit 28 for the Deposition of David Browne), there are three additional pages. Two of these pages refer to USAA Federal Savings Bank and are dated January 18, 2007. One page is identifiable as a "Statement of Credit Denial, Termination or Change" and the second is identifiable as a "Credit Score Disclosure Notice." The third page is also dated January 18, 2007, listing only Plaintiff's name and a set of four credit risk scoring codes and descriptions, and identifying itself as "page 2 of 2," makes no

reference to USAA Federal Savings Bank and thus it is inconclusive as to whether or not this page relates to a loan application by Plaintiff with USAA Federal Savings Bank.

11. The "Statement of Credit Denial, Termination, or Change" dated January 18, 2007 and identifying the creditor as USAA Federal Savings Bank indicates, via a checked box, that the "[p]rincipal reason(s) for credit denial" was "Foreclosure or Repossession." Based on the documents I have reviewed, it is clearly evident that Plaintiff's property in San Francisco was subject of actual repossession by the lender in 2002. The fact that "foreclosure" and "repossession" are represented by the same "check box" indicates that the lender does not make a distinction between whether a loan default resulted in "foreclosure", "deed-in-lieu of foreclosure" or "repossession" in its credit decision-making process. The fact that the credit risk codes for "foreclosure", "deed-in-lieu of foreclosure" and "repossession" on home loans are identical further serves to reinforce this notion that lenders view "foreclosures", "deed-in-lieu of foreclosures" and "repossession" as functionally the same in their credit decision-making process.

12. The "Statement of Credit Denial, Termination, or Change" dated January 18, 2007 and identifying the creditor as USAA Federal Savings Bank also indicates that the "credit score used by the lender is 718" and that the "credit score was created on January 12, 2007". This credit score (718) and credit score creation date is essentially identical to one of the credit report scores (718) provided on the Pentagon Federal Credit Union (CredStar) page also dated January 12, 2007.

13. The "718" credit score from the "CredStar" January 12, 2007 page is associated with the credit score model, "FICO Risk Score Classic 98." Experian does not make use of a credit risk scoring model that is identified as "FICO Risk Score Classic 98"; however, Trans

Union has identified one of its scoring models as the "FICO Risk Score Classic 98." This would strongly suggest that the source of the CredStar credit report with a score of 718 was Trans Union. As the scoring models and resultant score ranges used by the three major credit reporting agencies are not the same—as reflected by the three disparate scores on the CredStar January 12, 2007—scores that "identically match" between the reports of the three major credit reporting agencies are infrequent.

13.   The fact that the "CredStar" credit report with a score of 718, dated January 12, 2007 matches the score and date listed on the January 18, 2007 USAA Federal Savings Bank credit score disclosure notice would strongly suggest that each of these reports came from the same source. This belief is reinforced by the fact that the four credit risk scoring codes (i.e., 39, 10, 2, 3) listed for the "718" credit report on the CredStar notice (differing from the other two reports on the CredStar notice) are also exactly the same as the four credit risk scoring codes (i.e., 039, 010, 002, 003) listed on the apparent "third page" relating to the USAA Federal Savings Bank loan application as "key factors which adversely affected the credit report score shown in the disclosure attached." The source of that credit report is believed to be Trans Union, and thus there is compelling evidence to believe that Trans Union was also the exclusive source of the "718" credit report that USAA Federal Savings Bank based its January 18, 2007 loan decision upon.

This declaration is made pursuant to 28 U.S.C. § 1746.  I declare under penalty of perjury that the foregoing is true and correct, on May 15, 2008 in Costa Mesa, California.

_____
David Browne