Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

ROBERT GORMAN,                  *
                                *
        Plaintiff,              *
                                *
VS.                             * Case No. 07 CV 1846
                                *
EXPERIAN INFORMATION SOLUTIONS, *
INC., EQUIFAX INFORMATION       *
SERVICES, INC., and HSBC        *
MORTGAGE SERVICES, INC.,        *
                                *
        Defendants.             *

ORAL DEPOSITION OF

KIMBERLY HUGHES

JANUARY 25, 2008

CONFIDENTIAL

        On the 25th day of January, 2008, at ^ 11:00 a.m., the oral deposition of the above-named witness was taken at the instance of the Plaintiff, Robert Gorman, before Sandi L. Voigt, Certified Shorthand Reporter in and for the State of Texas, at the offices of Jones Day, located at 2727 North Harwood, in the City of Dallas, County of Dallas, State of Texas, pursuant to Notice and the agreements hereinafter set forth.

Case 1:07-cv-01846-RPP   Document 42-5   Filed 06/06/08   Page 2 of 17
Kimberly Hughes                                    Robert Gorman/Experian Information Solutions, Inc., et al

Page 32

```
 1    to have reviewed the documents first.
 2         Q.   (BY MR. MALLON)  Okay.  Were these documents
 3    forwarded to HSBC?
 4         A.   No.
 5         Q.   Okay.  Were any documents forwarded to HSBC
 6    in this case?
 7         A.   The -- we transmitted the contents of the
 8    ACDV form which indicated a description of the
 9    documents that we had received.
10         Q.   Okay.  So is that a no?
11              MR. GIBBS:  Objection.
12         A.   No, sir.  That was my answer to your
13    question.  There was -- there was a document
14    transmitted electronically which was the ACDV form
15    which contained a description of the document.
16         Q.   (BY MR. MALLON)  Okay.  Other than the ACDV
17    form, was there anything transmitted to HSBC in this
18    case?
19              MR. GIBBS:  Objection, asked and
20    answered.
21         A.   No, sir.
22         Q.   (BY MR. MALLON)  Okay.  So Mr. Gorman's
23    letter, which would be page 2 of Exhibit 7, was never
24    forwarded to HSBC; is that correct?
25              MR. GIBBS:  Objection, asked and
```

Case 1:07-cv-01846-RPP   Document 42-5   Filed 06/06/08   Page 3 of 17
Kimberly Hughes                                    Robert Gorman v. Experian Information Solutions, Inc., et al

Page 33

1    answered.
2        A.   No, sir, it was not.
3        Q.   (BY MR. MALLON)  Why don't we go to the ACDV
4    which you're referring to which we've had marked as
5    Plaintiff's Exhibit 31.  And that would be probably the
6    third page of that that you're referring to, is that
7    right, Ms. Hughes?
8        A.   Yes, if we're -- if we're looking at the one
9    that is involving the letter that we just discussed.
10       Q.   And there's a -- up top, there is a box of
11   the Dispute Reason.  Do you see that?
12       A.   Yes.
13       Q.   Okay.  And after that, there's a number.  It
14   says 106?
15       A.   Yes.
16       Q.   And after that, it says, Disputes
17   Present/Previous Account Status, History.  Verify
18   Accordingly.
19       A.   Yes.
20       Q.   Okay.  What does the 106 refer to?
21       A.   It's the number for that dispute code in the
22   E-OSCAR system.
23       Q.   Okay.  What's the E-OSCAR system?
24       A.   The web base system that Experian uses along
25   with other reporting agencies and the creditors to

Case 1:07-cv-01846-RPP   Document 42-5   Filed 06/06/08   Page 4 of 17
Kimberly Hughes                                    Robert Gorman v. Experian Information Solutions, Inc., et al

Page 34

1   transmit these dispute verification forms.
2        Q.   Okay.  And you said -- you indicated there
3   are certain codes that are used within that process?
4             MR. GIBBS:   Objection to form.
5        A.   Yes.
6        Q.   (BY MR. MALLON)  Okay.  And what do those
7   codes stand for?
8        A.   The code translates to the text that you read
9   into the record.
10       Q.   Okay.  So there are various codes that the
11  customer service rep can choose from when conveying a
12  dispute?
13       A.   Yes.
14       Q.   Okay.  And it is, in fact, the policy of
15  Experian that Experian never forwards documents other
16  than an ACDV to a furnisher of information as part of
17  its reinvestigation process; is that correct?
18            MR. GIBBS:   Objection to form,
19  mischaracterizes prior testimony.
20       A.   Experian does not transmit actual documents.
21  It does convey the contents of those documents or a
22  description of those documents in the verification
23  form.
24       Q.   (BY MR. MALLON)  Okay.  So it will describe
25  the documents, but it won't actually send the documents

Page 71

1   Zarlock.

2              MR. GIBBS:  -- prior testimony.

3              MR. OLSON:  Form.  Olson.

4       A.   Well, in the history grid to Experian, there
5   was a 90 day late being reported in May of 2002, so
6   there was a previous 90 day delinquency reported to
7   Experian.

8       Q.   (BY MR. MALLON)  Okay.  But they also -- at
9   that time, Experian -- HSBC also reported to Experian
10  that Mr. Gorman had been 180 days late on this account,
11  right?

12             MR. GIBBS:  Objection to form.

13             MR. ZARLOCK:  Objection to the form.
14  Zarlock.

15      A.   It did carry history through September of '02
16  which did have a 180 day delinquency.

17      Q.   (BY MR. MALLON)  Okay.  And then here it
18  appears that HSBC is telling Equifax that the worst
19  Mr. Gorman ever was was 90 days late, correct?

20             MR. GIBBS:  Objection to form.

21             MR. ZARLOCK:  Objection to the form.
22  Zarlock.

23      A.   At this time, yes, that's what's being -- it
24  looks like is being conveyed.

25      Q.   (BY MR. MALLON)  So you would agree that

Case 1:07-cv-01846-RPP   Document 42-5   Filed 06/06/08   Page 6 of 17
Kimberly Hughes                                    Robert Gorman v. Experian Information Solutions, Inc., et al

Page 72

1    that's a discrepancy, right?
2              MR. GIBBS:  Objection to form.
3              MR. OLSON:  Objection, form.
4         A.   Again, I can't say.  I can't say if it was
5    wrong the first time or if HSBC made some sort of
6    decision to stop reporting certain information.  You
7    would have to ask them that question.
8         Q.   (BY MR. MALLON)  Okay.  But my only question
9    is, you'd agree that they're different -- the
10   information is different?
11             MR. GIBBS:  Objection to form --
12             MR. OLSON:  Objection to form.
13             MR. GIBBS:  -- asked and answered.
14        A.   Yes.  The reportings to Experian contained
15   additional late payments then as reported here.
16        Q.   (BY MR. MALLON)  Okay.  And what, if
17   anything, did Experian do in response to receipt of
18   this information?
19             MR. GIBBS:  Objection to form.
20             MR. ZARLOCK:  Objection to form.
21        A.   The transaction detail on this indicates that
22   Experian did not make any updates based on this because
23   our system is telling us that we had just received
24   direct contact back from the same creditor in response
25   to our own ACDV.  We received the response on

Case 1:07-cv-01846-RPP   Document 42-5   Filed 06/06/08   Page 7 of 17
Kimberly Hughes                                    Robert Gorman/Experian Information Solutions, Inc., et al

Page 73

1    September 12th.  So seven days earlier, we had received
2    direct contact from them.  And if it's within the same
3    reporting period, we take our direct contact over a
4    carbon copy because we don't necessarily have the same
5    internal status codes as the other bureaus.
6        Q.   (BY MR. MALLON)  Okay.  But a 3 is a -- a 3
7    is 90 days no matter who it's being reported to,
8    correct?
9                 MR. GIBBS:  Objection to form --
10                MR. OLSON:  Objection to the form.
11                MR. GIBBS:  -- asked and answered.
12       A.   That's correct, but they may be cutting their
13   history off on a certain date.  We wouldn't be aware.
14   And again, seven days earlier we had received a direct
15   response from the creditor, and we take our direct
16   contact with them over a carbon copy from another
17   bureau during the same period.
18       Q.   (BY MR. MALLON)  So you'll -- basically
19   you'll go with what they're telling Experian as opposed
20   to what they've told Equifax seven days later?
21                MR. ZARLOCK:  Objection to form.
22                MR. GIBBS:  Objection to form,
23   mischaracterizes her testimony.
24       A.   If it --
25                MR. OLSON:  Objection to form.  Olson.

Case 1:07-cv-01846-RPP   Document 42-5   Filed 06/06/08   Page 8 of 17
Kimberly Hughes vs. Robert Gorman/Experian Information Solutions, Inc., et al

Page 74

```
 1        A.   If it happens that close to our direct
 2   contact, yes.  If it happens outside of 30 days within
 3   our direct contact, if we're able to decipher the
 4   updates, we'll take them.
 5        Q.   (BY MR. MALLON)  Okay.  So 30 days is
 6   basically the cutoff?
 7             MR. GIBBS:  Objection to form.
 8        A.   Yes.
 9        Q.   (BY MR. MALLON)  Okay.  And then you said
10   again, able to decipher -- able to decipher this
11   information.  Is that the term you used?
12        A.   Yes.  There may be codes that the other
13   bureau uses that we don't have.  So if we don't have
14   their codes, we can't cross up the information.  But if
15   we're able to make updates based on the response, we'll
16   do so.
17        Q.   Okay.  And who were you getting this
18   information from?  Is it from Equifax?  Is it from HSBC
19   or is it from E-OSCAR?
20             MR. GIBBS:  Objection to form, asked and
21   answered.
22        A.   Well, technically, it's from both because the
23   sum of this form contains information from Equifax and
24   from HSBC.  It does come through E-OSCAR, but I can't
25   answer for you the technicalities of whose response
```

```
 1   actually triggers the notification.
 2        Q.   (BY MR. MALLON)  Okay.  But the information
 3   comes directly from E-OSCAR to Experian, correct?
 4        A.   Yes.
 5        Q.   Okay.  The information did not in this case
 6   come from HSBC, correct?
 7             MR. ZARLOCK:  Objection to the form.
 8             MR. GIBBS:  Objection to form.
 9        A.   Technically, I can't answer that question.  I
10   don't know.  I mean, it's -- there's information
11   transpiring from -- from Household through E-OSCAR, so
12   if technically that means it came from them, you know,
13   I don't --
14        Q.   (BY MR. MALLON)  Okay.  But --
15        A.   I'm not -- I'm not a systems technical
16   person.  I just know that the carbon copies result from
17   that contact and it's sent to us through E-OSCAR.
18        Q.   Okay.  So you don't get anything directly
19   from HSBC.  It's just through E-OSCAR?
20             MR. GIBBS:  Objection to the form --
21             MR. ZARLOCK:  Objection to form.
22             MR. GIBBS:  -- asked and answered.
23        A.   We're being carbon copied, so to me, that is
24   not direct contact.
25        Q.   (BY MR. MALLON)  Okay.
```

1     A.   It's a carbon copy.

2     Q.   And, in fact, before you indicated that you
3 were going to -- Experian's policy was to rely upon its
4 direct contact with the furnisher if it's within 30
5 days, correct?

6             MR. GIBBS:  Objection to form.

7     A.   That's correct.

8     Q.   (BY MR. MALLON)  So obviously Experian makes
9 the distinction between a direct contact from HSBC as
10 indicated in the ACDV and from this carbon copy it
11 received from E-OSCAR, correct?

12             MR. GIBBS:  Objection to form.

13             MR. OLSON:  Objection, form.

14     A.   Yes, sir, there is that distinction, but
15 whether or not the information in the carbon copy
16 technically is generated by them, I can't answer that.
17 That's a technical E-OSCAR question.

18     Q.   (BY MR. MALLON)  Okay.  Yeah.  That's --
19 that's not what I'm asking you.

20     A.   Okay.

21     Q.   I mean, I think it's pretty clear that this
22 information ultimately did come from HSBC.  I'm just
23 asking you if essentially HSBC ever contacted Experian
24 on or after September 19th of 2006 and said, Look,
25 here's the information we're updating to Equifax.

Case 1:07-cv-01846-RPP   Document 42-5   Filed 06/06/08   Page 11 of 17
Kimberly Hughes                                 Robbie Gordon v. Experian Information Solutions, Inc., et al

```
 1                 MR. GIBBS:  Objection to form.
 2                 MR. ZARLOCK:  Objection to the form.
 3    Zarlock.
 4        A.   It would be my position that they did not
 5    directly notify Experian that a change needed to be
 6    made.
 7        Q.   (BY MR. MALLON)  Okay.  And, in fact, that
 8    would be a superior method in receiving this
 9    information from E-OSCAR because the code -- you would
10    get Experian's direct code instead of Equifax's,
11    correct?
12                 MR. GIBBS:  Objection to form.
13                 MR. ZARLOCK:  Objection to the form.
14    Zarlock.
15                 MR. OLSON:  Objection to form.  Olson.
16        A.   They could -- if they wanted to recontact
17    Experian, they could do so through a number of ways.
18    They could do so through their monthly tape or they
19    could also use a method similar to this through E-OSCAR
20    called an AUD or automated universal data form which
21    they do send directly to Experian through E-OSCAR.
22        Q.   (BY MR. MALLON)  Okay.  An AUD you said was
23    an automated -- can you help me there?
24        A.   Automated universal data form.
25        Q.   Universal data form.  What is an AUD?
```

1    A.    A universal data form is a means which a
2    creditor can communicate with a credit bureau out of
3    the ordinary reporting process, so it's not in response
4    to an investigation.  And if they don't want to wait
5    for their monthly tape cycle to update, they can do
6    like an instant update.  In the olden days, they were
7    just universal data forms and they were sent through
8    the mail, but now that we have E-OSCAR, it's an
9    automated transmission, thus, it's now called an AUD.
10    Q.    Okay.  And the purpose of an AUD then would
11    be to update account information to all the credit
12    reporting agencies, not just one, correct?
13                MR. ZARLOCK:  Objection to the form.
14    Zarlock.
15                MR. GIBBS:  Objection to the form.
16    A.    Well, my understanding is it's typically --
17    AUDs are typically sent to all reporting agencies that
18    the company reports to, but I suppose it could just be
19    notification to one bureau if they're aware that they
20    gave, you know, different information.
21    Q.    (BY MR. MALLON)  Okay.  Well, what does the
22    term "universal" mean in that description, if you know?
23                MR. GIBBS:  Objection to form.
24                MR. ZARLOCK:  Objection to form.
25    Zarlock.

Case 1:07-cv-01846-RPP   Document 42-5   Filed 06/06/08   Page 13 of 17
Kimberly Hughes                    Robert Gorman v. Experian Information Solutions, Inc., et al

Page 79

```
 1        A.   I just know that that's what it's called.
 2        Q.   (BY MR. MALLON)  Okay.  You don't know
 3   specifically what that term means?
 4             MR. GIBBS:  Objection to form, asked and
 5   answered.
 6        A.   No, sir.
 7        Q.   (BY MR. MALLON)  Okay.  And in this case,
 8   just to be clear, HSBC never sent an automated
 9   universal data form to Experian at any point after
10   September 8th of 2006?
11             MR. GIBBS:  Objection to the form --
12             MR. ZARLOCK:  Objection to form.
13             MR. GIBBS:  -- asked and answered.
14        A.   This is the only record of profile
15   maintenance that was found for Mr. Gorman and that was
16   the carbon copy.
17        Q.   (BY MR. MALLON)  So is that a no?
18             MR. GIBBS:  Objection to form.
19             MR. OLSON:  Objection to form.
20        A.   Our records don't indicate -- our records
21   indicate no.
22        Q.   (BY MR. MALLON)  Okay.  That's all I'm
23   asking.  Let's go back to the transaction log for a
24   second.  You said these codes -- like under the payment
25   history, there's Ds, 3s, 2s and 1s.  You've even got a
```

1   A.   No. What this is, there's a box that comes
2   up on the Internet that prompts the consumer. If they
3   want to type any additional information for us to pass
4   along to the data furnisher, to type it there, so this
5   was what he wanted to convey to HMS.
6   Q.   Okay. And is there any way here where it
7   indicates what the results of that dispute were?
8   A.   Yes, sir. The response reason indicates that
9   it was a remains, which indicates that the response was
10  verified as reported.
11  Q.   Okay. And then if we go -- actually, there's
12  two more pages here, but they don't look like they
13  contain any more dispute information, do they?
14  A.   I'm not sure where you're at. I'm sorry.
15  Q.   Okay. The final two pages of this exhibit.
16  A.   Okay. No. These are disclosure logs, and
17  both of these indicate that Mr. Gorman contacted
18  Experian on two separate occasions to obtain copies of
19  his disclosure.
20  Q.   Okay. Okay. We're done with that document.
21  I want to go back to -- you don't need to look at the
22  transaction log, but what we were referring to -- you
23  indicated that HS -- I mean, that Experian did not
24  update its account information regarding the subject
25  account due to its policies. The information it got

Case 1:07-cv-01846-RPP   Document 42-5   Filed 06/06/08   Page 15 of 17
Kimberly Hughes                                              Robert Gorman v. Experian Information Solutions, Inc., et al

Page 108

```
 1   was within 30 days of the direct information it got
 2   from HSBC; is that correct?
 3              MR. GIBBS:  Objection to form.
 4        A.    That's correct.  That's just regarding a
 5   carbon copy.
 6        Q.    (BY MR. MALLON)  Right.  So if HSBC had
 7   contacted Experian on or after September 19th and given
 8   it different information, Experian would have updated
 9   the account accordingly, correct?
10              MR. ZARLOCK:  Objection to the form.
11   Zarlock.
12              MR. GIBBS:  Objection to form.
13        A.    That's correct.
14        Q.    (BY MR. MALLON)  Okay.  And when Experian
15   received the ACDV from HSBC in this case -- why don't
16   we actually go back to that document.  It should be
17   Exhibit 31, page 3.  Do you have that in front of you,
18   Ms. Hughes?
19        A.    I do.
20        Q.    Okay.  Subscriber response categories on the
21   left there, do you see that?
22        A.    Yes.
23        Q.    That's how it actually then reported the
24   account from that point forward, correct?
25              MR. ZARLOCK:  Objection to form.
```

Case 1:07-cv-01846-RPP   Document 42-5   Filed 06/06/08   Page 16 of 17
Kimberly Hughes                    Rodelio Coclan v. Experian Information Solutions, Inc., et al

Page 110

```
 1        Q.   (BY MR. MALLON)  Okay.  But the only reasons
 2   you would disregard what they're telling you to do is
 3   in the categories you just described, correct?
 4             MR. GIBBS:  Objection to form.
 5        A.   That's correct.
 6        Q.   (BY MR. MALLON)  Okay.  So Experian
 7   essentially relies upon HSBC to reinvestigate this
 8   matter and then report those results, correct?
 9             MR. GIBBS:  Objection to form --
10             MR. ZARLOCK:  Objection to form.
11             MR. GIBBS:  -- asked and answered.
12        A.   That's correct.
13        Q.   (BY MR. MALLON)  Okay.  It doesn't conduct
14   its own reinvestigation into this dispute?
15             MR. GIBBS:  Objection to form,
16   mischaracterizes what she said.
17        A.   Well, we do go to the reporting source which
18   is the company who has the relationship with the
19   subscriber, but independent of that and reviewing any
20   information sent in by the consumer themselves, we
21   don't do any other independent investigation.
22        Q.   (BY MR. MALLON)  Okay.  So you rely upon the
23   furnisher to do the investigation?
24             MR. GIBBS:  Objection to form,
25   mischaracterizes what she just said.
```

```
 1      A.   We do contact the data furnisher or the
 2  reporting source for the investigation, yes.
 3      Q.   (BY MR. MALLON)  Okay.  That's fine.
 4           MR. MALLON:  Let's -- give me one --
 5  literally one minute here.  Let's go off the record.
 6           (Off the record.)
 7      Q.   (BY MR. MALLON)  Ms. Hughes, do the customer
 8  service representatives who conduct disputes have a
 9  certain amount of disputes that they are expected to
10  complete on a daily basis?
11           MR. GIBBS:  Objection to form.
12      A.   No, sir, they don't.
13      Q.   (BY MR. MALLON)  There are no targets or
14  goals for them?
15           MR. GIBBS:  Objection to form.
16      A.   They do have goals in their job performance,
17  but it has nothing to do with the amount of disputes
18  that they perform.
19      Q.   (BY MR. MALLON)  Okay.  What are the goals in
20  their job performance, then?
21           MR. GIBBS:  Objection to form.
22      A.   Well, I certainly can't testify to every
23  little thing.  You know, showing up to work on time,
24  being a good team member.  The main thing that our
25  agents are graded on or judged on, if you will, is
```